IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

OLAWOLE OLAYINKA          :
5121 Sante Fe Court          :
Ellicott City, Maryland  21043          :
                                    :
    Plaintiff,          :
                                    :
v.                                    :          Civil Case No.
                                    :
STEVEN MNUCHIN, SECRETARY          :
U.S. DEPARTMENT OF          :
THE TREASURY          :
1500 Pennsylvania Avenue, N.W.          :
Washington, D.C.  20220          :
                                    :
    Defendant.          :
                                    :
    <u>Serve</u>          :
                                    :
    Jessie K. Liu          :
    United States Attorney for the          :
    District of Columbia          :
    555 4th Street N.W.          :
    Washington, D.C.  20530          :
                                    :

**<u>COMPLAINT</u>**

    Plaintiff Olawole Olayinka, by and through his counsel of record, hereby files his Complaint against Defendant Steven Mnuchin, Secretary, U.S. Department of the Treasury, for employment discrimination on the basis of race, color, national origin and gender and retaliation for engaging in protected activity in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e, *et. seq.*

**<u>PARTIES</u>**

    1.    Plaintiff Olawole Olayinka ("Plaintiff") is an individual resident of the State of Maryland.

2.      Defendant Steven Mnuchin ("Defendant") is the Secretary of the U.S. Department of the Treasury, a federal agency that maintains its headquarters at 1500 Pennsylvania Avenue, N.W., Washington, D.C. 20220.

## JURISDICTION AND VENUE

3.      This action arises under the laws of the United States; specifically, Title VII of the Civil Rights Act of 1964 as amended, 42 U.S.C. § 2000e, *et. seq.*  This Court therefore has original jurisdiction of this civil action pursuant to 28 U.S.C. § 1331.

4.      All of the events giving rise to the claims asserted in this lawsuit occurred in this judicial district; accordingly, venue is proper herein pursuant to 28 U.S.C. § 1391.

## FACTS

5.      The United States Mint ("Mint") is a Bureau of the U.S. Department of the Treasury, the Defendant herein, and maintains its headquarters at 801 9th Street, N.W., Washington, D.C. 20220.

6.      Plaintiff is a black male and a native of Nigeria.  Plaintiff came to the United States when he was seventeen (17) years of age and became a U.S. citizen in 2000.

7.      Plaintiff commenced employment with the Mint at its Washington, D.C. headquarters on January 26, 2003 as a GS-14 Lead IT Specialist.  In this position, Plaintiff's duties included leading IT projects, contract oversight and providing guidance relating to infrastructure modernization and standardization.

8.      In 2005, Plaintiff was promoted to Branch Chief of Infrastructure and Operations. In this role, Plaintiff had a number of responsibilities, including planning and redesigning the Mint's IT infrastructure to support the Mint's critical business applications and enhancing IT discipline, processes, documentation and contract services.

9.    In 2011, Plaintiff was promoted to the position of Information Technology Supervisory Specialist, GS-2210-15, and since that time, has served as the Mint's Infrastructure and Operations Division Chief.  In this position, Plaintiff has broad responsibility for IT policy, planning, budgeting and the implementation of IT initiatives.  Plaintiff's duties include ensuring that IT services and operations are driven by program/mission business needs that are in accordance with Federal regulations and directives, leading major IT projects, coordinating needed changes across the department, reviewing Mint-related IT contracts, service-level agreements, budget submissions, providing recommendations and solutions and advising the Mint's Chief Information Officer ("CIO") on the impact of the strategic plan on the Information Technology Division's ("ITD") organizational structure and workforce.

10.    Throughout his lengthy career with the Mint, Plaintiff has performed his job in an exemplary manner.  Prior to the events giving rise to this litigation, Plaintiff consistently received outstanding ratings on his annual performance appraisals while working under and supporting eight (8) different Chief Information Officers during the course of his tenure.

11.    For example, on his Performance Appraisal Plan for Supervisory Employees covering the period October 2013 through September 2014 (FY14), Plaintiff achieved ratings of "Exceeds" in all critical elements and was awarded a final summary rating of "Outstanding" based upon his score of 200 points, which was the highest score possible.

12.    During Plaintiff's tenure as the Mint's Infrastructure and Operations Division Chief, the Mint has been consistently recognized among the U.S. Treasury Department's thirteen (13) Bureaus as a leader in technology innovation, performance and security compliance.

13.    In the spring of 2013, Plaintiff met with Beverly Babers ("Babers"), an African American female who was then the Mint's Chief Administrative Officer.  During this meeting,

Babers informed Plaintiff that she had heard many good things about Plaintiff's work ethic and complimented his efforts.  Babers then steered the discussion to the vacant Deputy CIO position, which was soon to be posted.  Despite the fact that Plaintiff was well-qualified to fill this position, Babers urged him not to apply because she wanted DeAnna Wynn ("Wynn"), an African American female, to fill the position.  Babers then extracted a promise from Plaintiff that he would support Wynn when she got the job.

14.    As it was clear from his discussion with Babers that he would not receive the job, Plaintiff did not apply for the Deputy CIO position when it was subsequently posted.  Wynn was selected for this position on November 25, 2013 and became Plaintiff's first level supervisor.

15.    Lauren Buschor ("Buschor"), a Caucasian female, joined the Mint on December 29, 2013 as its CIO, becoming Plaintiff's second level supervisor.

16.    As detailed herein, shortly after Buschor assumed her position, she singled Plaintiff out and began subjecting him to discriminatory treatment because of his race, color, national origin and/or sex, which manifested itself in various forms of disparate treatment, including, but not limited to: (i) unjustified and excessive monitoring; (ii) unwarranted criticism; (iii) exclusion from meetings, decision making processes and major initiatives concerning matters for which he should have been directly involved; (iv) repeatedly treating Plaintiff with a lack of respect and condescension at departmental meetings; (v) engaging in intimidating behavior; (vi) undermining Plaintiff's authority, credibility, work and his relationships with other managers, his subordinates, peers and contractors; (vii) denying Plaintiff training opportunities directly related to his job duties; (viii) interfering with Plaintiff's promotional opportunities; (ix) denying performance awards; and (x) failing to support Plaintiff in his role as Division Chief.

Buschor did not display such discriminatory animus to employees or contractors outside of Plaintiff's protected class.

17.     From 2013 to the present, Plaintiff has been denied the opportunity to compete or act as the Mint's CIO, Deputy CIO or Chief Technical Officer (a position created by Buschor and given to Joseph Gioeli ("Gioeli"), a Caucasian male, without the position being competed) because he is a male of African origin with a dark complexion.

18.     In 2014, without any legitimate justification, Buschor asked several Mint Human Resource employees how she could go about replacing Plaintiff with Gioeli (who was officially hired as a GS 15 IT Specialist) shortly after he joined the Mint in May 2014.

19.     On August 11, 2014, Plaintiff sent an email to Buschor detailing his concerns regarding the aggressive, dismissive, antagonistic and disparate manner in which she was treating him and how this behavior was undermining his authority and negatively impacting his ability to lead his division.

20.     That same day, Wynn met with Plaintiff in his office and admitted that Buschor's behavior towards Plaintiff was inappropriate and needed to be addressed and she agreed to discuss the issue with Buschor upon her (Wynn's) return from vacation.  Buschor also responded to Plaintiff's email, stating that she intended to contact Workforce Solutions to arrange for a facilitator to help address Plaintiff's concerns.

21.     Following Plaintiff's August 11, 2014 email, Buschor failed to arrange for a facilitator as promised.  Buschor also changed tactics and began treating Plaintiff more respectfully during their interactions, but continued to actively undermine his authority during her interactions with his subordinates and contractors working under his oversight, further damaging his credibility as Division Chief.  For example, Plaintiff was excluded from several

meetings regarding potentially moving the Mint's email to the cloud and his input was not sought when the decision was made despite the fact that this issue fell squarely within Plaintiff's purview of responsibilities.

22.    Buschor also began diminishing Plaintiff's job responsibilities without any legitimate justification.  For example, although Plaintiff had done an exemplary job managing his team's credit card use for many years, Buschor eliminated Plaintiff's authority to approve credit card purchases for his team without any legitimate justification.

23.    On November 13, 2014, Plaintiff escalated his concerns regarding Buschor to Baber via electronic mail.  Babers promised to meet with Plaintiff to discuss his concerns when she returned from vacation.

24.    Babers later met with Plaintiff in December 2014 at which time Plaintiff explained in detail how Buschor was subjecting him to harassment, unprofessional behavior, was abusing her authority and committing waste.   Plaintiff also stated his belief that he was being discriminated against by Buschor because he was black and retaliated against because he had advised Buschor against wasteful spending and pursuing initiatives that were not in the best interests of the Mint and U.S. government.

25.    Upon information and belief, in violation of the Mint's internal policies and procedures, Plaintiff's discrimination complaint was not reported or investigated.

26.    On January 23, 2015, months after Buschor's promise to engage the services of a facilitator to help resolve Plaintiff's concerns regarding Buschor's behavior, Plaintiff and Buschor participated in a facilitation meeting led by a third party neutral.  During the session, Buschor admitted engaging in many of the behaviors Plaintiff found objectionable.  Buschor also recommended that Plaintiff come to her directly with any issues, bypassing Wynn because

Buschor did not "trust" her.  During the session, Buschor gratuitously commented that "there is no onion that you peel that does not hurt the eyes," insinuating that if she had the inclination, she could unearth wrongdoing on Plaintiff's part.

27.     In approximately this same time frame, during a Senior Executive Staff meeting with the Mint's new director, Rhett Jepson, Mr. Jepson commended Buschor for ITD's successful completion of the OMS II project.  Instead of acknowledging her staff for their contributions to the project's success, Buschor responded that the ITD "still has a whole lot of 'ugly babies' and she would need to do some cleaning up."   Upon information and belief, Buschor's use of the term "ugly babies" was a direct reference to Plaintiff, who had been a target of her harassment and discriminatory behavior since nearly the inception of his employment at the Mint.

28.     Unbeknownst to Plaintiff, Buschor had, many months earlier, initiated an investigation of Plaintiff for allegedly conducting unauthorized searches of the Mint Symantec Enterprise Vault ("eVault") email archiving and retrieval system.   In fact, Buschor had no evidence that Plaintiff was conducting such unauthorized searches, but used this baseless allegation as a pretext to cloak her discriminatory animus towards Plaintiff and to engineer his removal.

29.     During the investigation, Plaintiff experienced major computer issues because of software Mint security had secretly installed on his computer to monitor his activities.   In addition, Buschor continued to demonstrate blatant disrespect towards Plaintiff in the presence of employees and contractors who were aware of the investigation and, as a result, also showed Plaintiff disrespect and refused to follow his directives because they believed he would eventually be removed.

30.     Buschor surreptitiously investigated Plaintiff over the course of seven (7) months, hiring outside consultants to conduct forensic examinations of Plaintiff's Mint-issued laptop and his network activities, ultimately finding no evidence that Plaintiff engaged in any impropriety whatsoever.

31.     On February 23, 2015, notwithstanding the fact that Buschor's allegations against Plaintiff could not be substantiated after an exhaustive investigation, Plaintiff was abruptly pulled out of a meeting and escorted to his office by armed Mint police officers.  There, Plaintiff was met by two (2) additional armed Mint police officers, Annie Brown (Associate Director of Workforce Solutions) ("Brown") and Jean Gentry (Mint General Counsel).  Brown advised Plaintiff that he was being placed on indefinite administrative leave effective immediately. When Plaintiff inquired why he was being placed on leave, Brown professed ignorance and merely smiled when Plaintiff told her she was making a terrible mistake.

32.     Plaintiff's Mint-issued laptop and other equipment was immediately confiscated and he was escorted from the building by armed Mint police officers in full view of other Mint employees.  Armed Mint police officers then escorted Plaintiff to his residence where, in full view of Plaintiff's neighbors, they entered his home, walked upstairs where Plaintiff's bedroom was located and confiscated his Mint-issued tablet.

33.     Following Plaintiff's forceful removal from Mint headquarters, a notice was posted on his office door which read: "Do not enter the office without the express permission of the United States Mint Police."  Plaintiff's name was still posted on the door of this office.  Upon information and belief, Buschor manipulated the Mint police to post this notice on Plaintiff's door to further isolate and humiliate Plaintiff and give employees the impression that he had committed a serious crime.

34.     Although she was unable to establish any wrongdoing on the part of Plaintiff over the course of her seven (7) month investigation, Buschor instigated a second investigation of Plaintiff by the U.S. Department of the Treasury's Office of Inspector General ("OIG), again alleging that Plaintiff had conducted unauthorized searches of the Mint Symantec Enterprise Vault (eVault) email archiving and retrieval system.  Although Buschor's allegations were meritless, they were used as the justification for placing Plaintiff on administrative leave pending the outcome of the OIG investigation.

35.     The manner in which Plaintiff was accompanied to his office, escorted out of the building and then to his residence by armed Mint Police in full view of his co-workers and neighbors, was deeply humiliating and caused Plaintiff to suffer extreme emotional distress and damaged his well-being.  The resulting damage to his professional and personal reputation and the uncertainty brought about by being placed on indefinite administrative leave with no explanation further exacerbated Plaintiff's emotional distress for which he was forced to seek medical treatment for severe anxiety and depression.

36.     Plaintiff did not learn why he was abruptly placed on administrative leave until July 20, 2015, when he was interviewed by OIG Special Agent Kevin Reis and OIG Investigator Thomas Trimble.  During the course of this interview, Plaintiff denied conducting unauthorized searches of the Mint Symantec Enterprise Vault (eVault) email archiving and retrieval system.

37.     On October 5, 2015, OIG issued its Report of Investigation regarding Buschor's allegations.  During the course of its seven (7) month investigation, OIG performed digital forensic examinations of Plaintiff's Mint-issued computer, analyzed eVault log files and interviewed numerous current and former Mint employees and contractors.  According the OIG Report of Investigation, "[n]o information was found to support the allegation during the

investigation" and the investigation determined that Buschor's allegation of misconduct on the part of Plaintiff "was unsubstantiated."

38.     Significantly, the OIG Report of Investigation criticized Buschor for bringing the allegations to OIG, noting "that a review of the eVault search logs against the Help Desk tickets and consulting with the [Mint] Office of Counsel and Police prior to hiring contractors to perform a forensic investigation and contacting [OIG] would have been a more prudent [approach]."

39.     Notwithstanding the fact that the OIG Report of Investigation fully exonerated Plaintiff, Mint management refused to allow Plaintiff to return to work and instead forced him to remain on indefinite administrative leave without providing any justification.

40.     On February 25, 2016, more than one (1) year after being placed on indefinite administrative leave, Plaintiff's legal counsel wrote Gentry, demanding that Plaintiff be returned to work immediately giving the findings of the OIG in October 2015.

41.     In February 2016, Plaintiff contacted the Mint EEO office to discuss his concerns that the actions taken against him by Buschor, Babers and Brown were based on his race, color national origin and sex.  Plaintiff initiated his EEO case on March 22, 2016 alleging the same forms of discrimination as noted during his prior EEO contact, naming Buschor, Babers and Brown as the responsible management officials.

42.     Gentry did not respond to Plaintiff's counsel's letter until May 10, 2016, during which time Plaintiff remained on administrative leave.  In her email to Plaintiff's counsel, Gentry noted that Plaintiff's administrative leave would end effective May 16, 2016, at which time he was expected to report to work at Mint headquarters at 9:00 a.m.

43.     Upon Plaintiff's arrival to work on May 16, 2016, instead of being allowed to resume his duties, Plaintiff was ushered into a room and advised by Brown and Gioeli that the Mint was initiating yet another internal investigation of 14 allegations that were essentially duplicative of the allegations for which he had been exonerated by the OIG in October 2015.

44.     At the aforementioned meeting, Plaintiff was provided with a memorandum from Brown, the Appointing Official, providing notice of the investigation and the designation of one of her employees, Dan Goldstein ("Goldstein"), as the Investigating Official.  The appointment of Goldstein as the Investigating Official was a transparent effort on the part of Mint management to obfuscate the fact that Buschor had manufactured the previous allegations against Plaintiff, to avoid involving OIG, who had recently exonerated Plaintiff of essentially the same charges, and to keep the investigation in-house, thereby allowing Buschor, Brown and Babers to improperly influence and control the investigation to ensure a finding of misconduct of sufficient magnitude to justify Plaintiff's removal.

45.     According to Brown's memorandum, Plaintiff would not have access to the Mint headquarters building during the investigation.   During the meeting, Plaintiff received a perfunctory open-ended work assignment from Gioeli to perform at home, but was advised that he would not be provided with a phone or computer nor would he have access to the Mint's network, making it nearly impossible for him to successfully perform his assignment and effectively extending his administrative leave into its fifteenth (15th) month.  Gioeli provided Plaintiff with some paper, pens and highlighters to perform his work assignment, warned Plaintiff not to communicate with other Mint personnel about his work assignment because he was under investigation and directed Plaintiff to contact him by telephone every work day at 8:00 a.m.

46.    Plaintiff filed his formal EEO Complaint on July 2, 2016, alleging discrimination on the basis of his race, color, national origin and sex, as well as retaliation for engaging in protected activity.

47.    In or about September 2016, OIG assumed control of the investigation of Buschor's allegations against Plaintiff.  Plaintiff was interviewed by OIG on September 28, 2016 and again on June 27, 2017, and again denied all material allegations of wrongdoing.

48.    On July 7, 2017, Buschor left the Mint and Wynn was named acting CIO a short time later.   Gioeli also left the Mint on November 21, 2017.

49.    OIG'S investigation was completed on October 6, 2017, spanning more than one (1) year.  During the investigation, Plaintiff remained at home and teleworked.  OIG found ten (10) of the fourteen (14) allegations against Plaintiff unsubstantiated.   The four (4) remaining allegations, all of which could be fairly characterized as trivial in nature, were substantiated by OIG; however, OIG determined that the substantiated allegations did not involve any significant wrongdoing on Plaintiff's part.  OIG's findings did not result in any formal disciplinary action against Plaintiff.

50.    Following the conclusion of the second OIG investigation, Plaintiff was not returned to work at headquarters, but instead was directed to continue to telework.  In this regard, Plaintiff had been tasked specifically to review the CCB/ARB process and provide thirteen (13) deliverables over a period of six (6) months.  The task Plaintiff was assigned was far below a GS-2210-15 primary job function and historically were assigned to a business analyst, GS-2210-14.  Nonetheless, as directed, Plaintiff continued to make the meaningless daily 8:00 a.m. phone call and he completed all assigned deliverables by December 2017.

51.     Significantly, Plaintiff did not receive any feedback on his work, demonstrating that the project he was assigned was not a legitimate effort to improve the CCB/ARB process, but was instead intended to further harass, intimidate and humiliate Plaintiff even though he had committed no wrongdoing.

52.     On December 13, 2017, nearly three (3) years after he was escorted out of Mint headquarters, Plaintiff was returned to work, but with diminished job responsibilities.

53.     In addition, as a result of the aforementioned discrimination and retaliation, Plaintiff was deprived of individual performance awards for fiscal years 2015 through 2017. Plaintiff was the only employee in the ITD that did not receive any spot awards during this time period.

54.     All conditions precedent to filing suit have been satisfied.

## COUNT I

## DISCRIMINATION – TITLE VII VIOLATIONS

55.     Paragraphs 1 through 54 above are hereby adopted and incorporated herein by reference.

56.     Plaintiff is an employee of Defendant as that term defined by Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et. seq*. ("Title VII").

57.     Defendant is an employer as defined by Title VII.

58.     Title VII prohibits employment discrimination on the basis of race, color, national origin and sex.

59.     Buschor, Brown and Baber's actions as described above, which are imputable to Defendant, constitute willful, intentional and unlawful employment discrimination against Plaintiff on the basis of his race, color, national origin and sex in violation of Title VII.

60.     As a result of Defendant's willful, intentional and unlawful discriminatory conduct, Plaintiff has suffered and will continue to suffer lost wages, severe mental and emotional distress, and other pecuniary and non-pecuniary damages.

61.     Defendant's actions as described above were undertaken with actual malice.

62.     All conditions precedent to Plaintiff's right of recovery have been fully satisfied.

WHEREFORE, Plaintiff respectfully prays that the Court grant the following relief:

a.      That judgment be entered in favor of Plaintiff and against Defendant for damages for back pay, loss of benefits and all other pecuniary damages in the amount of $300,000 or such other amount as may be established at trial;

b.      That judgment be entered in favor of Plaintiff and against Defendant for compensatory damages in the amount of $300,000;

c.      That Plaintiff be awarded reasonable attorney's fees and all costs and expenses incurred by Plaintiff in bringing this action;

d.      Pre and post judgment interest at the highest rate permitted by law; and

e.      Such other and further relief as the Court deems just and proper.

## COUNT II

## HOSTILE WORK ENVIRONMENT – TITLE VII VIOLATION

63.     Paragraphs 1 through 62 above are hereby adopted and incorporated herein by reference.

64.     Buschor, Brown and Baber's discriminatory actions as described above were unwelcome, based upon Plaintiff's race, color, national origin and/or sex and were sufficiently severe or pervasive to alter the conditions of his employment and to create an abusive work environment.

65.     The actions of Buschor, Brown and Baber as described above are imputable to Defendant.

66.     As a result of Defendant's willful, intentional and unlawful discriminatory conduct, Plaintiff has suffered and will continue to suffer lost wages, severe mental and emotional distress, and other pecuniary and non-pecuniary damages.

67.     Defendant's actions as described above were undertaken with actual malice.

68.     All conditions precedent to Plaintiff's right of recovery have been fully satisfied.

WHEREFORE, Plaintiff respectfully prays that the Court grant the following relief:

a.     That judgment be entered in favor of Plaintiff and against Defendant for damages for back pay, loss of benefits and all other pecuniary damages in the amount of $300,000 or such other amount as may be established at trial;

b.     That judgment be entered in favor of Plaintiff and against Defendant for compensatory damages in the amount of $300,000;

c.     That Plaintiff be awarded reasonable attorney's fees and all costs and expenses incurred by Plaintiff in bringing this action;

d.     Pre and post judgment interest at the highest rate permitted by law; and

e.     Such other and further relief as the Court deems just and proper.

## COUNT III

## RETALIATION – TITLE VII VIOLATION

69.     Paragraphs 1 through 68 above are hereby adopted and incorporated herein by reference.

70.     By complaining about being discriminated against by Buschor, Brown and Baber on account of his race, color, national origin and sex, Plaintiff engaged in statutorily protected activity.

71.     Plaintiff was subjected to adverse employment action following his protected activity, including, without limitation, being placed on extended administrative leave.

72.     A causal connection exists between Plaintiff's protected activity and the adverse action to which he was subjected.

73.     Buschor, Brown and Baber's actions as described above, which are imputable to Defendant, constitute willful, intentional and unlawful retaliation against Plaintiff as a result of statutorily protected activity in violation of Title VII.

74.     As a result of Defendants' willful, intentional and unlawful conduct, Plaintiff has suffered and will continue to suffer lost wages, severe mental and emotional distress, and other pecuniary and non-pecuniary damages.

75.     Defendant's actions as described above were undertaken with actual malice.

76.     All conditions precedent to Plaintiff's right of recovery have been fully satisfied.

WHEREFORE, Plaintiff respectfully prays that the Court grant the following relief:

a.      That judgment be entered in favor of Plaintiff and against Defendant for damages for back pay, loss of benefits and all other pecuniary damages in the amount of $300,000 or such other amount as may be established at trial;

b.      That judgment be entered in favor of Plaintiff and against Defendant for compensatory damages in the amount of $300,000;

c.      That Plaintiff be awarded reasonable attorney's fees and all costs and expenses incurred by Plaintiff in bringing this action;

d.      Pre and post judgment interest at the highest rate permitted by law; and

e.      Such other and further relief as the Court deems just and proper.

                         Respectfully submitted,

                         LAW OFFICE OF MARC J. SMITH, LLC


                 By:      _____Marc J. Smith_____
                         Marc J. Smith
                         Bar No. 14355
                         401 North Washington Street
                         Suite 500
                         Rockville, Maryland 20850
                         Phone: (301) 838-8950

                         Counsel for Plaintiff

                 **TRIAL BY JURY DEMANDED**

Plaintiff hereby requests trial by jury.


                 By:   __Marc J. Smith_____
                         Marc J. Smith